|                                     |     |                         |
|-------------------------------------|-----|-------------------------|
| DEANDRE CRAWFORD,                   | )   |                         |
|                                     | )   |                         |
|                                     | )   |                         |
| Plaintiff,                          | )   | No. 14 C 06211          |
|                                     | )   |                         |
| v.                                  | )   |                         |
|                                     | )   | Judge Edmond E. Chang   |
| ANN DAVIS-HUNTLEY and               | )   |                         |
| WEXFORD HEALTH SOURCES, INC.,       | )   |                         |
|                                     | )   |                         |
| Defendants.                         | )   |                         |

## MEMORANDUM OPINION AND ORDER

Plaintiff Deandre Crawford is a prisoner at Stateville Correctional Center. Since 2013, Crawford has suffered from severe abdominal and testicular pain, and he alleges that he has not received adequate medical treatment for those conditions.[1] R. 38, Am. Compl.[2] Crawford contends that one of his treating physicians, Dr. Davis, is liable for her failure to treat him, and that Wexford Health Sources, which provides medical care for Stateville, is liable because its practices caused lengthy delays in his treatment. *Id*. ¶¶ 26-44. After a long and contentious discovery period, Davis and Wexford moved for summary judgment. R. 150, Mot. Summ. J. For the reasons explained below, summary judgment is denied on the claim against Davis, and denied in part on the claim against Wexford.

---

[1]The Court has subject-matter jurisdiction over this case under 28 U.S.C. §§ 1331.

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

# I. Background

In deciding Crawford's motion for summary judgment, the Court views the evidence in the light most favorable to Crawford, because he is the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Crawford is imprisoned in Stateville Correctional Center. DSOF ¶ 1.[3] The process of obtaining medical care at Stateville is known as "sick call." *Id.* ¶ 8. Inmates request medical treatment by filling out a sick-call request form and placing the form in the bars of their cells to be picked up. *Id.*[4] Until December 2013, sick-call requests were screened by certified medical technicians (called CMTs). Pl. Resp. DSOF ¶ 11. The CMT could then refer the inmate to "MD sick call." *Id.* Despite the name, "MD sick call" actually refers to medical care provided not only by physicians, but also mid-level providers (such as physician's assistants and nurse practitioners). DSOF Exh. E, Funk Dep. 48:4-19; DSOF ¶ 10. Starting around December 2013, inmates would first see a nurse as part of "nurse sick call" and then be referred by the nurse to MD sick call. Pl. Resp. DSOF ¶ 11.

In addition to regular MD sick call, Stateville physicians saw patients with certain chronic conditions—hypertension, diabetes, asthma, and seizures—at daily "chronic care clinics." DSOF Exh. C, Davis Dep. 21:8-11, 26:19-27:11. Inmates

---

[3]Abbreviations for citations to the parties' Local Rule 56.1 Statements are as follows: "DSOF" for the Defendants' Statement of Facts [R. 152], "PSOF" for Crawford's Statement of Additional Facts [R. 165]; "Def. Resp. PSOF" for the Defendants' Response to Crawford's Statement of Facts [R. 178]; and "Pl. Resp. DSOF" for Crawford's Response to the Defendants' Statement of Facts [R. 165]. Crawford also filed sealed, unredacted versions of his Statement of Facts and Response to Defendant's Statement of Facts, along with accompanying sealed exhibits [R. 169]. Defendant also filed a sealed response to Plaintiff's sealed Statement of Facts was filed [R. 182].

sometimes complained about other conditions at the chronic care clinics, but they were discouraged from doing so. *Id*. 28:21-29:12, 128:1-23. Inmates who raised non-emergency concerns during a chronic care clinic were told to use the ordinary sick-call procedure to seek treatment. *Id*. 29:2-12.

### A. March 2013-June 2013

On March 30, 2013, a CMT received a note from Crawford stating that Crawford was experiencing testicular and abdominal pain and requesting to be placed on sick call for evaluation. DSOF ¶ 26. Crawford's medical records state that he was referred to MD sick call for evaluation and treatment. *Id*. But Crawford was not promptly seen at sick call; instead, it took about three months (until late June 2013) for Crawford to get treatment. *See id*. ¶ 37. The parties dispute the reasons for the delay. *See* Pl. Resp. DSOF ¶¶ 27-30. The Defendants point out that Crawford missed several other medical and mental health appointments during the time gap. R. 151, Def. Mem. at 1; DSOF ¶¶ 27-30. But Crawford responds that there is no evidence about why he missed these other appointments, and avers that he would not have refused to go to sick call. *See* Pl. Resp. DSOF ¶¶27-31.; *see also* PSOF Tab 1, Crawford Aff. ¶ 2.

After several missed appointments, Crawford presented to Dr. Davis at the chronic care clinics for hypertension and seizure on May 14, 2013. DSOF ¶ 31. Crawford says that he complained to Davis about his abdominal and testicular pain

---

[4]In late 2014 or early 2015, the sick-call request process changed to require inmates to sign their names on a sheet on a common area (instead of filling out a sick-call slip). DSOF ¶ 9; PSOF Tab 15 at 3136 (sealed). That change is not relevant to this case.

at this appointment. PSOF ¶ 65, Pl. Resp. DSOF ¶ 31. Davis, however, did not note any complaints about abdominal or testicular pain in Crawford's medical records, and did not provide any treatment for those conditions. DSOF ¶ 31, DSOF Exh. F at 24-28 (sealed).

Crawford finally got treatment for his abdominal and testicular pain in late June 2013, when he saw physician's assistant La Tanya Williams. DSOF ¶ 37. At this appointment, Williams diagnosed Crawford with an enlarged prostate, ordered various tests, and prescribed Hytrin, a drug often used to treat the symptoms of an enlarged prostate. *Id*; Pl. Resp. DSOF ¶ 37. Williams followed up with Crawford around six weeks later. DSOF ¶ 39, DSOF Exh. F at 34 (sealed). She noted that Crawford's symptoms were only slightly improved and increased his Hytrin dose. *Id*.

## B. August 2013-May 2014

On August 17, 2013, Crawford saw Davis at the seizure chronic clinic. Once again, Crawford asserts that he complained of testicular and abdominal pain to Davis, but Davis did not record those complaints. DSOF ¶ 41; PSOF ¶ 65. There is no record of Davis providing treatment to Crawford for abdominal or testicular pain during this encounter. DSOF Exh. F at 37-38 (sealed).

From late August to sometime in September 2013, Stateville entered an extended lockdown. PSOF ¶ 66.[5] During the lockdown, sick call was suspended. *Id*. Eventually, Wexford began sending nurses to see patients in the cell houses, but MD

---

[5]The Defendants point out that the evidence suggests that the entire facility was not on lockdown the entire time; rather, certain cell blocks were locked down at different times. Def. Resp. PSOF ¶ 66.

sick call did not take place. Def. Resp. PSOF ¶ 66; DSOF Exh. C, Davis Dep. 165:11-22. Around this time, Crawford began to complain frequently of testicular and abdominal pain. Specifically, between September 17, 2013 and January 5, 2014, Crawford submitted 14 sick-call requests about the pain. PSOF ¶ 68; PSOF Tab 2.[6] Despite his many requests, Crawford was not seen in connection with his testicular and abdominal pain until January 13, 2014—almost three months after the September 17 sick-call request. DSOF ¶ 43. The January 13 appointment was with a nurse or CMT, not a physician or physician's assistant. DSOF Exh. F at 43 (sealed). At this appointment, Crawford reported pain that rated "10/10" on the pain scale, and also reported that it "[f]eels like someone is squeezing it." *Id*. Under the "plans" section of the pertinent medical record, the staff member wrote "MD PA referral," but Crawford did not see a doctor or physician's assistant for several weeks after that. *See id.*; DSOF ¶¶ 43-46.

Even when Crawford did see a physician, he did not get treatment for the abdominal and testicular pain. On January 24, 2014, Crawford saw Davis at the seizure and hypertension clinics. DSOF ¶ 46. Crawford complained to Davis about the pain, but Davis did not record these complaints or provide any treatment. PSOF ¶ 65; DSOF ¶ 46; DSOF Exh. F at 46-49 (sealed); PSOF Tab 3, 1/26/14 Grievance.

---

[6]Defendants argue that there is "no indication" that the sick-call requests were actually submitted or that they were received. But Crawford testified that he *did* submit the sick call requests through the sick call process, DSOF Exh. B, Crawford Dep. 151:23-152:24, and that testimony must be accepted as true for summary judgment purposes. The defense's contention that perhaps the sick-call requests were not actually received (even if submitted) is also of no help to the Defendants at this stage of the case, because the evidence must be viewed in Crawford's favor in evaluating the summary judgment motion.

Two days later, Crawford filed a grievance complaining about the continuing lack of treatment for the abdominal and testicular pain and stating that Davis had refused to acknowledge the issue. PSOF Tab 3, 1/26/14 Grievance.

Despite his requests for help, Crawford still did not receive treatment for his pain. He continued to complain about the ongoing abdominal and scrotal pain at nurse sick call over the next five months, *see* DSOF ¶ 48, 51; PSOF ¶ 71, but apparently got no help for the conditions. At one of these appointments, Crawford reported "grabbing, squeezing pain [through] my whole body." DSOF Exh. F at 55 (sealed); PSOF ¶ 70. The nurse noted that Crawford should follow up at urgent care "as scheduled," but there is no evidence that he was seen at urgent care. PSOF ¶ 70. The Defendants point out that Crawford missed several medical appointments during this time period, but again, it is not clear why. *See* Pl. Resp. DSOF ¶ 50, 52, 55, 57.

At long last, on May 13, 2014, Crawford saw physician's assistant Williams for his scrotal pain. DSOF ¶ 58. Williams diagnosed Crawford with epididymitis, which is an inflammation of the coiled tube (epididymis) at the back of the testicle. PSOF ¶ 72. Williams prescribed Cipro, an antibiotic. *Id*. When Crawford followed up with Williams in June 2014, he reported that the pain had improved. *Id*. ¶ 73. Williams continued Cipro and prescribed Naproxen. DSOF ¶ 59. Williams ordered a follow-up in six weeks. Pl. Resp. DSOF ¶ 59.

### C. June 2014-January 2015

In July 2014, Crawford saw a Wexford physician's assistant and reported abdominal pain that radiated to his rectum. PSOF ¶ 74. Noting Crawford's

"longstanding abdominal pain," the physician's assistant referred Crawford to Stateville's medical director for evaluation. *Id*. The notation "8/19/14" was made in Crawford's medical records next to the referral plan. *Id*. Crawford saw Stateville's then-medical director, Dr. Obaisi, on August 19, 2014. *Id*. ¶ 75. There is no evidence that Obaisi treated Crawford for abdominal or testicular pain during this appointment, but also no evidence that Crawford complained to Obaisi of abdominal or testicular pain. *Id*.; *see* DSOF Exh. F at 84 (sealed).

It does not appear that Crawford complained of abdominal or testicular pain for the next several months (though he was seen by multiple providers, including physicians, for other issues during that time). *See* DSOF Exh. F at 85-95. Then, on January 10, 2015, Crawford presented at nurse sick call with abdominal pain that radiated to his testicles and rectum. PSOF ¶ 76. The nurse noted that an appointment with a physician was already scheduled for January 28, 2015. *Id*. Sure enough, on January 28, Crawford was seen by Obaisi for his abdominal pain. *Id*. ¶ 77. Obaisi diagnosed Crawford with prostatitis, and prescribed Bactrim, an antibiotic. *Id*., DSOF Exh. F at 97 (sealed). After that, Crawford did not complain of abdominal pain for about a year. *See* PSOF ¶ 78.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

The Eighth Amendment requires prisons to provide humane conditions of confinement, including adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment (which is incorporated against state officials through the Fourteenth Amendment's due process clause). *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976). To determine whether the Eighth Amendment has been violated, the Court asks whether the plaintiff suffered from an objectively serious medical condition, and

if so, whether the defendant was deliberately indifferent to that condition. *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016).

## A. Objectively Serious Medical Condition

As a threshold matter, there is ample evidence from which a reasonable jury could conclude that Crawford had an objectively serious medical need at all times relevant to this case. A "serious" medical need is one that a physician has diagnosed as needing treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009).

Viewing the evidence in Crawford's favor, a reasonable factfinder could readily find that Crawford suffered from severe pain over a period of several years. In a grievance filed in 2014, Crawford stated that "[t]he pain was so great that I had to stay in the fetal position for two days. This has been an ongoing issue since '12." PSOF Tab 3, 4/11/14 Grievance. At one appointment, Crawford rated his pain as "10/10" on the pain scale and described the sensation as "like someone is squeezing it." DSOF Exh. F at 43 (sealed). At other times, he rated his pain as a 7 or 8 out of 10, and reported "grabbing, squeezing pain [through] my whole body." PSOF ¶ 70; DSOF Exh. F at 55, 59 (sealed). Even a layperson could conclude that this kind of severe pain, recurring over a period of several years, required treatment. *See, e.g.*, *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005); *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997).

What's more, even if Crawford's need for treatment was not self-evident, two different Stateville medical professionals diagnosed Crawford with three different medical conditions: benign prostatic hyperplasia (in layman's terms, an enlarged prostate), epididymitis, and prostatitis. *See* DSOF ¶ 37; PSOF ¶ 72, 77. After each diagnosis, these medical professionals provided treatment—which itself suggests that these were conditions that "a physician has diagnosed as needing treatment."[7] DSOF ¶¶ 37, 58; PSOF ¶¶ 72, 77; *see Knight*, 590 F.3d at 463. From all this evidence, a reasonable jury could conclude that Crawford had an objectively serious medical need during the relevant time periods.

## B. Deliberate Indifference

The next question is whether the two defendants—Dr. Davis and her then-employer, Wexford Health Sources—were deliberately indifferent to Crawford's serious medical need. A plaintiff need not prove that a defendant intended harm or believed that harm would occur to succeed on a claim of deliberate indifference. *Petties*, 836 F.3d at 728. But deliberate indifference is more than negligence or even the civil form of recklessness. *Id.* "[A] plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Id.* (citing *Farmer*, 511 U.S. at 837).

### 1. Dr. Davis

Crawford saw Davis three times during Davis's brief tenure at Stateville: once in May 2013, again in August 2013, and lastly in January 2014. DSOF ¶¶ 31, 41, 46.

---

[7]Williams is a physician's assistant, not a physician, but she is qualified to diagnose and treat medical conditions. DSOF Exh. D, Williams Dep. 144:6-21, 154:17-155:8.

Each encounter took place at Stateville's chronic care clinics, which are designed to address specific chronic health conditions. *Id*. But inmates did sometimes complain of unrelated health problems at the chronic care clinics. DSOF Exh C, Davis Dep. 28:21-29:12. And even if Stateville's policy instructed prisoners not to raise unrelated medication conditions during clinic appointments, completely ignoring a serious medical need presented at the chronic clinic could still amount to deliberate indifference. The fact that Crawford voiced his complaints at the chronic clinics does not necessarily dispose of the deliberate indifference claim against Davis (although of course a jury could find otherwise).

The bigger stumbling block for Crawford (though it is still not fatal) is that there is some uncertainty about *when* exactly he told Davis about his testicular and abdominal pain. Crawford's testimony on the subject is ambiguous—he states that he complained of pain to Davis, but does not make clear whether he complained more than once, or at which appointment he complained. *See* DSOF Exh. B, Crawford Dep. 66:9-21, 106:12-15, 109:22-110:2, 157:7-23, 161:7-10. Despite the ambiguity, based on his deposition testimony, Crawford asserts in his Local Rule 56.1 Statement of Facts that he complained to Davis during each of his encounters with her. *See* PSOF ¶ 65.

Reading the record in the light most favorable to Crawford and drawing all reasonable inferences in his favor, a jury could find that Crawford complained to Davis during all three appointments. First, there is contemporaneous evidence that he complained of pain during the January 2014 appointment. Crawford filed a grievance dated two days after that appointment stating that he had told Davis about

his pain and that she refused to treat him. PSOF Tab 3, 1/26/14 Grievance. This contemporaneous evidence supports Crawford's assertion that he reported pain to Davis in January 2014. Second, there is also a reasonable inference that Crawford mentioned his pain during the August 2013 appointment. Although Crawford did not explicitly testify as to the date in his deposition, he stated during a line of questioning about the August 2013 appointment that he told Davis he was having pain. *See* DSOF Exh. C, Davis Dep. 105:17-106:12, 109:22-110:2. In the context of the line of questioning, it is fair to infer that Crawford was testifying that he reported the pain to Davis during the August 2013 appointment.

The record evidence is shakiest on the May 2013 appointment, but a jury could conclude that Crawford complained to Davis at that appointment as well. Crawford's medical records show that Crawford had been experiencing testicular and abdominal pain since January 2013. *See* DSOF Exh. F at 30 (sealed). Crawford put in a sick-call request to be seen for that pain in late March 2013—around six weeks before his May 2013 encounter with Davis. *See* DSOF ¶¶ 26, 31. Given the longevity of the pain and Crawford's relatively recent sick-call request, it is likely that the testicular and abdominal pain would have been very much on Crawford's mind in May 2013. What's more, Crawford's appointment with Davis was his first opportunity to see a doctor since submitting the sick-call request in March.[8] In context, it would be reasonable

---

[8]It is true that a note in Crawford's file showed that Crawford was a no-show for an MD sick call appointment and two chronic-clinic appointments in early May. *See* DSOF ¶¶ 28-30. But Crawford disputes that he refused medical treatment on these dates. *See* Pl. Resp. DSOF ¶¶ 28-30; PSOF Tab 1, Crawford Aff. ¶ 2. At this point, there is no evidence that Crawford was responsible for the missed appointments, and the Court cannot infer that he

for a jury to infer that Crawford voiced his concerns to Davis at their first meeting in May 2013.

It is also reasonable to infer that Davis was aware that Crawford had a serious medical need. True, Crawford's deposition testimony on this point is not detailed—he testified that he remembers telling her "about the pain I was having," DSOF Exh. B, Crawford Dep. 66:14-16—but the lines of questioning were all about the abdominal and testicular pain, so the lack of specificity is not fatal. It is fair to infer, in the context of all the other evidence, that Crawford conveyed the severity of his abdominal and testicular pain to Davis. Even at his first appointment with Davis, Crawford had been suffering untreated pain for around five months. *See* DSOF Exh. F at 30 (sealed); DSOF ¶ 31. There is simply no reason that Crawford would not have conveyed the duration and severity of his pain to Davis—or so a jury could find. So on these facts, a jury could conclude that Davis knew that Crawford had an objectively serious medical need.

A jury could also find that Davis was deliberately indifferent to that serious medical need. Davis did not record Crawford's complaints of pain during any of the three appointments (assuming, of course, that he actually did complain). *See* DSOF ¶¶ 31, 41, 46. There is no evidence that Davis provided any treatment for the pain or took any steps to ensure that Crawford would receive treatment (such as scheduling a follow-up visit). *See* DSOF Exh. F at 24-28, 37-38, 46-49 (sealed). Indeed, the Defendants do not even try to argue that Davis treated Crawford for the testicular

---

was, because inferences must be drawn in Crawford's favor at this stage. Of course, a jury might interpret the evidence differently.

and abdominal pain, choosing to hang their hat on the argument that Crawford did not tell Davis that he was in pain at all. *See* Def. Mem. at 6-7. Taking the facts and inferences in the light most favorable to Crawford, Davis was informed about Crawford's severe pain on three separate occasions during a period of less than a year and did absolutely nothing to help him. A jury could conclude that Davis's inaction manifested deliberate indifference. *See, e.g., Diggs v. Ghosh*, 850 F.3d 905, 910 (7th Cir. 2017) (jury could find deliberate indifference when inmate informed doctor about painful medical condition and doctor did not recommend *any* treatment).

Of course, this analysis takes all facts in Crawford's favor, as dictated by the summary judgment standard. The evidence takes on a different light at trial, where Crawford will have the burden of proof and the jury will be free to make credibility determinations. But for now, Crawford's claim against Davis passes muster.[9]

---

[9]In the opening motion, Davis includes an argument that she is entitled to qualified immunity, but acknowledges that the Seventh Circuit has held that qualified immunity is not available to private-corporation medical providers in state prisons. R. 151, Def. Br. at 14-15; *Petties v. Carter*, 836 F.3d 722, 734 (7th Cir. 2015) (*en banc*) (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 794 (7th Cir. 2014)). Davis apparently wants to preserve the issue for appeal, but she barely develops the argument, primarily referring to a Supreme Court opinion, *Filarsky v. Delia*, 566 U.S. 377, 393 (2012), that predates both *Petties* and *Shields*. Indeed, *Filarsky* distinguished the most directly applicable precedent, *Richardson v. McKnight*, 521 U.S. 399, 413 (1997), noting that *Richardson* held that qualified immunity was unnecessary for guards employed by a private prison-security company, similar to private medical-services firms. *See Filarsky*, 566 U.S. at 393 (quoting *Richardson*, 521 U.S. at 413) (qualified immunity unnecessary for employees of "a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms"). In any event, in light of controlling Seventh Circuit authority, there is no need to decide the issue.

### 2. Wexford

Next up are Crawford's claims against Wexford. As an initial matter, Wexford argues that it cannot be liable because Crawford has not established a viable deliberate indifference claim against Davis. R. 177, Def. Reply at 5-6. That argument fails because Crawford *does* have a viable claim against Davis, as discussed above. But it is worth noting that even if Davis had prevailed on her motion for summary judgment, this is one of the rare cases where Wexford could still be liable even in the absence of individual liability. *See Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 304 (7th Cir. 2010). In *Thomas*, the Seventh Circuit explicitly rejected the argument that a municipal entity can only be liable if its individual employees are liable: "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Id.* at 306 (emphasis in original). This rule means that municipalities (and government contractors like Wexford) cannot dodge liability by obscuring which individual employees were responsible for a constitutional violation, or by diffusing responsibility so widely that *no* individual employee could ever be held responsible. In this case, there is no inconsistency problem with finding Wexford liable and Davis not liable, so Wexford could be liable even if Davis is not.

As a private corporation acting under color of law, Wexford can be held responsible for constitutional violations under the standard laid out in *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). *Shields v. Ill. Dept. of Corr.*, 746 F.3d 782, 790

(7th Cir. 2014).[10] That means that Wexford is liable for constitutional violations caused by (1) an official policy adopted and promulgated by its officers; (2) a corporate practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. *Thomas*, 604 F.3d at 303 (citing *Monell*, 436 U.S. at 690). Crawford is pursuing a "practice or custom" theory, and so must show that Wexford policymakers were "deliberately indifferent as to the known or obvious consequences" of that practice or custom. *Thomas,* 664 F.3d at 303. In other words, Wexford policymakers must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect Crawford. *Id.* Finally, Crawford must show that the Wexford custom or practice caused his injuries. *Id.*

Crawford alleges that Wexford engaged in three practices that led to unconstitutional delays in his treatment. First, he asserts that Wexford allowed MD sick call backlogs to accumulate. R. 166, Pl. Resp. at 7. Second, he argues that Wexford failed to track and process inmate grievances. *Id*. Third, he argues that Wexford failed to administer sick call in accordance with Illinois Department of Corrections guidelines. *Id*. According to Crawford, these practices caused three periods of unjustifiable delay in his medical treatment. *Id*. The Court will discuss each period of delay in turn.[11]

---

[10]In *Shields*, the Seventh Circuit questioned whether *Monell* is the right standard for liability of corporations acting under color of law. But the *Monell* standard still governs for now. *See, e.g.*, *Norwood v. Ghosh*, 723 F. App'x 357, 360-61 (7th Cir. 2018); *Glisson v. Ind. Dept. of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017).

[11]Wexford argues that the *Monell* theories are "new" claims that were not pled in the Amended Complaint. *See* Def. Reply at 6-7. That is not the case. In the Amended Complaint,

### a. March 2013-June 2013

First, Crawford asserts that Wexford unconstitutionally delayed his medical care from March 30, 2013 (when he submitted a sick-call request on the testicular and abdominal pain) until late June 2013 (when he finally was treated by Williams). *See* Pl. Resp. at 15. When Crawford complained of pain in March 2013, his complaint was read and recorded by a Wexford CMT. DSOF ¶ 26; DSOF Exh. F at 21 (sealed). The CMT planned to refer Crawford to MD sick call for an evaluation, but, taking the facts in the light most favorable to Crawford, that did not happen. *See* DSOF ¶¶ 26-32; Pl. Resp. DSOF ¶¶ 26-32. Instead, it took almost three months and more complaints from Crawford to get treatment.[12] *See* DSOF ¶¶ 32, 37; PSOF ¶ 65. A reasonable jury could find that this three-month delay violated Crawford's constitutional rights.

A reasonable jury could also find that Wexford's practices caused the delay. Crawford has collected evidence demonstrating a substantial backlog of inmates waiting for MD sick call during the time that he was waiting for medical attention. Stateville medical-service records show that in May and June 2013, over 200 inmates had to wait three or more days to be seen at MD sick call. R. 169, PSOF Tab 11 at

---

Crawford alleged that Wexford and its staff ignored his sick call requests, that Wexford had a policy or practice of denying medical care during lockdowns, and that Wexford had a policy or practice of denying or delaying access to physicians and delaying or denying diagnoses and medical treatment. Am. Compl. ¶¶ 18, 32-33. To be sure, these allegations have developed and become more narrow and specific through discovery. That is what is supposed to happen as a case progresses, and the entire point of the discovery process. So Wexford's argument that Crawford's *Monell* claims are outside the scope of his Amended Complaint is rejected.

[12]Again, although Crawford missed some appointments during those three months, it is not clear that he was responsible for the missed appointments, so the Court cannot hold those against him at this stage. The jury will be free to draw a different inference.

003118 (sealed). It is not surprising that MD call would be so backed up, because Stateville was operating at half the capacity allotted for physicians for almost a year before Dr. Davis's arrival in April 2013. Specifically, Stateville was supposed to have two full-time, on-site physicians: a medical director and a staff physician. But before April 2013, Wexford left the staff physician position unfilled for around one year. PSOF ¶ 101.[13] Despite the consistently high backlogs for MD sick call, Wexford did not recruit more physicians or physician's assistants until May 2017. PSOF ¶ 103.[14]

Other Wexford records confirm that Wexford was having systemic problems managing a timely sick call. In an internal audit for the first quarter of 2013, Wexford gave itself scores of "0" for the following metrics: "Sick call requests are picked up daily [or] another method present that allows inmates to request service daily"; "Complaint is triaged within 24 hours of receipt"; and "Is seen by a [qualified health practitioner] within 24 hours (72 on weekends) of triage." R. 169, PSOF ¶ 91 (sealed); PSOF Tab 14 at 3171 (sealed).[15] Also, Wexford scored itself a "0" for "# of sick call

---

[13] It is not clear how long the position was unfilled, but Dr. Davis testified that she thought that the position was unfilled for around one year before she arrived. DSOF Exh. C, Davis Dep. 117:9-11.

[14] Defendants assert that Wexford's corporate representative, Dr. Funk, testified that additional staff were brought in to help with backlogs. However, the most Funk could say was that staff were brought in at "various dates" between March 2013 and the present. This vague testimony carries little or no weight, especially because Wexford's services adjustment requests do not reflect the addition of more physicians or mid-level providers. *See* PSOF Tab 18. And even if Funk was correct that Wexford sometimes brought in additional staff to help with backlogs, the persistently high backlogs over the relevant time periods demonstrate that the additional staff were not enough.

[15] The Defendants object to the use of Wexford's internal audits and corrective action plans on the grounds that they contain subsequent remedial measures taken by Wexford, *see* Fed. R. Evid. 407, and that they are privileged under the Illinois Medical Studies Act, 735 ILCS 5/8-2101 *et seq.* Defendants, however, do not develop either of these arguments in their briefs. Perfunctory and underdeveloped arguments are forfeited. *Harvey v. Town of Merrillville*, 649 F.3d 526, 532 (7th Cir. 2011).

backlog (those inmates waiting 8 days or longer from [sick call request] to provider appointment)." *Id*. That metric suggests that treatment delays were long for at least 10% of the inmates requesting care (and possibly many more). *Id*. Similarly, Wexford's Corrective Action Plan for Quarter 1 of 2013 noted problems with sick call processing, including "[s]ick call is not being tracked, logged, triaged, or followed per [IDOC regulations]," and "[p]rocess within sick call [is] not laid out for staff, uncertainty on whom is responsible for what." PSOF ¶ 92 (sealed), PSOF Tab 15 at 3141 (sealed).

Of course, Wexford's failure to meet its own goals or to comply with IDOC regulations does not *itself* establish a constitutional violation. Wexford and IDOC guidelines are not necessarily congruent with the constitutional standard of care. *See, e.g., Glisson v. Ind. Dept. of Corr.*, 849 F.3d 372, 380 (7th Cir. 2017). But the evidence *does* tend to show that Wexford regularly failed to conduct sick call in a timely manner, that inmates routinely experienced long wait times before receiving care, and that Wexford did not have an effective process for tracking sick call requests and ensuring follow-up. The danger posed by these practices is evident even to someone without medical training: long wait times between requests for medical attention and treatment create an obvious risk of prolonging painful medical conditions, allowing existing medical conditions to worsen, and failing to diagnose serious medical conditions. Indeed, the fact that Wexford and IDOC had goals for quick processing of sick call requests demonstrates that Wexford was aware of the importance of handling requests for treatment in a prompt and organized manner. And Wexford's

own internal audits and evaluations are circumstantial evidence that Wexford policymakers were aware of the significant problems with sick call (and the accompanying risk of serious harm to sick inmates). In short, there is evidence from which a reasonable factfinder could conclude that Wexford's sick-call practices posed a serious risk of harm to inmates, and that Wexford policymakers knew about this risk and failed to address it. A jury could reasonably infer that these systemic failures caused Crawford's problems with getting care during this first period of delay. So the claim against Wexford for the March 2013-June 2013 delay survives.

### b. August 2013-May 2014

The next period of delay began in August 2013, when Crawford complained to Davis about his testicular and abdominal pain. *See* Pl. Resp. at 4. This delay was even more egregious (or so a reasonable jury could find) than the first: it took about nine months from Crawford's initial complaint for him to get treatment, despite at least 20 separate complaints by Crawford. *See* PSOF ¶¶ 68, 71; DSOF ¶¶ 43, 45, 46, 48, 51. This prolonged denial of treatment in the face of Crawford's repeated requests for assistance over the better part of a year could easily be found to exhibit deliberate indifference.

As with the first period of delay, there is ample evidence that Wexford's sick-call practices caused the delayed treatment. Wexford continued to have alarming backlogs for MD sick call from September 2013 through May 2014. *See* PSOF Tab 11 at 3118 (sealed). In September 2013, the backlog for MD sick call was an abundant (to say the least) 245 inmates. *Id*. For the rest of 2013 and the first two months of

2014, the backlog hovered at around a still-dismal 200 inmates. *Id*. Things improved slightly by March and April of 2014, but the backlog was still high: over 100 inmates waited more than three days for MD sick call in each of those months. *Id*. In May 2014—the month that Crawford finally received treatment—the backlog was better, but not by much: 84 inmates waited three days or more for MD sick call. *Id* at 3123.

What's more, Wexford's Corrective Action Plans tell a story of delay and dysfunction in sick-call processing during this time period. For example, the November 2013 Corrective Action Plan noted that "[sick-call requests] are not being filed in the chart," that the "[l]og is not being completed," and that "[w]ithout the slip and log there is no way to track timeliness." PSOF Tab 15 at 3161 (sealed). The same reports noted "CMT vacancies," which was a serious concern because CMTs were responsible for collecting, recording, and triaging inmate sick call requests. *Id*. Given this evidence, a reasonable jury could conclude that Wexford's practices of allowing lengthy sick-call backlogs and failing to process or track sick-call requests presented obvious risks that Wexford policymakers knew about and failed to address. A jury could also reasonably infer that these practices caused the nine-month delay between Crawford's initial request for help and his eventual treatment.[16]

--------

[16]In addition to his complaints about sick-call backlog and sick-call request processing, Crawford also asserts that Wexford's handling of medical grievances caused the unconstitutional delay in his treatment. It is not necessary to address that argument because there is evidence that Wexford's other practices caused the injury. But it is worth noting that Crawford's evidence about Wexford's grievance practices would not alone have been enough to withstand summary judgment. It is true that there is evidence that Wexford used inmate grievances to track inmate medical care, and that grievances were not being processed in a timely manner. PSOF Tab 15 at 3137 (sealed), DSOF Exh. E, Funk Dep. 141:15-24, 142:21-143:4. But the evidence does not show that *Wexford* (as opposed to the IDOC) was responsible for the failure of the grievance process. The IDOC is generally responsible for processing

### c. June 2014-January 2015

Last up is Crawford's claim that he was denied medical care for his abdominal and testicular pain between June 2014 and January 2015. Here again, Crawford argues that Wexford's practices of allowing MD sick call backlogs to accumulate and failing to properly administer MD sick call caused his treatment to be delayed. *See* Pl. Resp. at 16. Unlike the other two periods of delay, however, this claim fails. The record evidence shows that Crawford was *not* denied access to MD sick call during this time period; indeed, he saw an MD or a physician's assistant at least three times during the asserted delay period. On the evidence as presented, a factfinder could not reasonably conclude that Wexford practices harmed Crawford by denying him access to MD sick call.

As a starting point, it is not clear that the start of the third period of delay should be dated from June 2014. In June 2014, Crawford actually received treatment for his epididymitis: he was seen for a follow-up by PA Williams, who noted that his pain had improved and renewed his antibiotic prescription. DSOF ¶ 59. Crawford did not complain of pain again until mid-July, when he was seen by another Wexford PA. PSOF ¶ 74. The PA noted Crawford's long history of abdominal pain and referred Crawford to Stateville's medical director. *Id*. That appointment was planned for August 19, 2014, and it took place as scheduled. PSOF ¶ 75. Obaisi did not treat

---

inmate grievances. *See* 20 Ill. Admin. Code § 504.800 *et seq*. If Crawford hopes to introduce evidence about the grievance process at trial, then he will need to demonstrate (with already-gathered evidence) *how* Wexford was responsible for any shortcomings in grievance processing, and how those shortcomings impacted Crawford's care.

Crawford for abdominal or testicular pain at that appointment, but there is also no evidence (not even from Crawford himself) that Crawford told Obaisi that he was still suffering from those conditions. *See* PSOF ¶ 75; DSOF Exh. F at 84 (sealed); DSOF Exh. B, Crawford Dep. 159:2-11.

There is no record of Crawford complaining of abdominal or testicular pain for the next several months. *See* DSOF Exh. F at 85-94 (sealed). Crawford had another appointment with an MD in November 2014 for an unrelated health problem, and there is no evidence that he complained of abdominal or testicular pain at that appointment. *Id.* at 94 (sealed). In fact, the MD note for that date states that Crawford had "[no] testicular masses or tenderness." DSOF Exh F. at 94. After that, it appears that another couple of months passed before Crawford complained of testicular and abdominal pain again. *See id.* 94-96 (sealed). This time, his treatment was relatively prompt: Crawford voiced a complaint at nurse sick call on January 10, 2015, and the nurse noted that Crawford was already scheduled to see a physician on January 28, 2015. *Id.* at 96 (sealed). The appointment took place as scheduled, and Obaisi treated Crawford for his pain. *Id.* at 97 (sealed).

That sequence of events refutes Crawford's assertion that Wexford's practices surrounding MD sick call caused unreasonable delay in his care. For this final period, it appears that when Crawford asked to be seen by a doctor, and he was. Of course, Crawford might argue that Obaisi should have treated his testicular and abdominal pain at the August appointment, because that is the reason that Crawford was scheduled to see Obaisi in the first place (and the complaints of pain were noted in

Crawford's medical records). But Crawford does not articulate a theory that would make *Obaisi's* alleged failure to read the medical records (if that is what happened) into a constitutional violation attributable to *Wexford*. This is not to say that there is no conceivable theory that would make Wexford responsible for repeated and widespread failures of its physicians to review medical records. But there is just no evidence in *this* case to tie that failure of care to a Wexford policy or practice. Crawford's only theory is that Wexford backlogs and sick-call practices prevented him from accessing MD sick call from June 2014 to January 2015. But for this last delay period, the evidence shows that that is not the case.[17] Without other evidence to attribute any delay in treatment to Wexford, summary judgment must be granted as to this time period. At trial, Crawford's claims against Wexford are limited to the alleged delays in treatment before June 2014.

### C. Punitive Damages

Punitive damages are available under Section 1983 when a defendant was "motivated by evil motive or intent" or manifested "reckless or callous indifference" to the plaintiff's constitutional rights. *Smith v. Wade,* 461 U.S. 30, 56 (1983). Although it is possible to conceive of a difference, the Seventh Circuit has held that the reckless-indifference standard for punitive damages is the same as the deliberate-indifference standard on liability. *See Woodward v. Corr. Med. Servs. of Ill., Inc.,* 368

---

[17]It is possible that Crawford might have been able to pull together some claim based on other delays within that time period. For example, the nurse sick call note for January 10, 2015 notes "3x same prob already sched for MD," suggesting that Crawford had complained of pain two or three times leading up to this appointment. But Crawford has not made that argument and has not developed any evidence about when he might have voiced these complaints (nor is that evidence obvious from Crawford's medical records).

F.3d 917, 930 (7th Cir. 2004), *Wright v. Miller*, 561 F. App'x 551, 555-56 (7th Cir. 2014); *Turner v. Pollard*, 564 F. App'x 234, 239 (7th Cir. 2014). So, on this record, a jury could reasonably award punitive damages against Davis and Wexford.

## IV. Conclusion

For the reasons discussed, summary judgment is denied as to Crawford's claims against Davis. Also, the claims against Wexford survive, but in a narrower version: Crawford can only pursue claims against Wexford arising out of his delayed treatment between March 2013 to June 2013, and then again from August 2013 to May 2014. Now that the summary judgment motion has been decided, the parties shall resume settlement negotiations. If the parties want a settlement referral to the magistrate judge, then they may contact the courtroom deputy at any time. Otherwise, the case will set for trial at the next status hearing. The status hearing of August 20 is reset to August 22, 2018, at 8:45 a.m.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: July 31, 2018